Opal Mae ELLEDGE, a Widow, et al., Appellants,

v.

GREAT AMERICAN INDEMNITY COMPANY, Appellee.

No. 13266.

Court of Civil Appeals of Texas.

Houston.

April 17, 1958.

Rehearing Denied May 8, 1958.

Joseph Kirchheimer, Houston, for appellant.

Kemper & Kemper, Houston, T. M. Kemper, Houston, of counsel, for appellee.

WERLEIN, Justice.

This is a workman's compensation suit brought by appellants, Opal Mae Elledge Chriceol (formerly Opal Mae Elledge, widow of Hugh Edward Elledge), joined by her husband Walter Chriceol, individually and as next friend of her minor children, David Lee Elledge, Wayne Edward Elledge, and Gary Dean Elledge, and David Lee Elledge, 19 years of age and married, against Great American Indemnity Company to recover compensation insurance as a result of the death of the said Hugh Edward Elledge. Appellants alleged that Hugh Edward Elledge on or about September 4, 1956, while in the course of his employment with Ervine & Bishop, sustained injuries resulting in his death. He was found dead on the premises of Ervine & Bishop on the morning of September 4, 1956. The parties to the suit stipulated that he died of an accidental injury on September 4, 1956, while on the premises of Ervine & Bishop, and that his average weekly wage was $42. The trial was to a jury, and after appellants rested the trial court directed that the jury return a verdict for appellee. Appellants have duly perfected their appeal to this Court.

It was proved that Hugh Edward Elledge, deceased, was and had been an employee of Ervine & Bishop for fifteen years prior to his death. He was a maintenance man, who helped operate the mill, and he was also a general handyman around the place. He and Mr. Pfeiffer, the mill superintendent, were the only white men who worked at the plant of Ervine & Bishop. The average work day was from 7:30 a. m. to 4:30 p. m. However, Mrs. Chriceol testified that the present plant had been located at 100 Katy Road since 1954 and that her husband had gone up there and worked at night. She testified that she had taken Elledge to the plant but did not stay out there when he night-watched because she had children. She had seen him go out there and unload things at the plant, and he had brought home overtime money to her from his night work.

Mr. Weber, an accountant for Ervine & Bishop and also for the Ranger Chemical Company, testified that the plant on Katy Road had an automatic sprinkler system to control fires and that a short time prior to September 3, 1956, the system was not operating, but that it was operating after September 3rd and the tank had been repaired. Apparently, Mr. Weber later learned from the A. D. T. Company that the repair job was completed on September 2, 1956. There is nothing to indicate that the deceased Elledge was aware of such fact. City of Houston police officer C. B. Massey testified that he received instructions from Captain Frank Murray of the Homicide Division to go to the plant at 100 Katy Road, which was the plant of Ervine & Bishop and Ranger Chemical Company, and that he arrived at approximately 8:30 a. m. on September 4, 1956. He saw Elledge's body lying in a pasture or field at the rear of the building on the premises of Ervin & Bishop. He examined the body and found a 2-inch jagged wound inside the left elbow. There was a barbed-wire fence about 10 feet from the body. There were some blood spots on the barbs of the wire of such fence and several blood spots on the ground underneath the fence and leading away from the fence toward the body. The body had nothing on it except a pair of trousers and belt. There were no weapons and no flashlight near the body. The body was muddy as if it might have rolled on the ground, and it had dry blood on it. Officer Massey testified that in one of the warehouses he saw a cot that looked like it had been slept in. There was found on the body a black leather billfold containing miscellaneous papers, one set of keys and 15 cents in change.

Appellants' First and Second Points of Error are to the effect that the trial court

erred in refusing to permit Opal Mae Elledge Chriceol to testify as to certain statements made to her by the deceased on the night of September 3, 1956, preceding his death on the morning of September 4, 1956; and also in refusing to permit Barbara Jean Noack to testify to such statements, she having overheard them.

The statements were made by deceased to his wife about 11:00 or 11:30 p. m. on September 3rd. The deceased had called for his wife about 9:00 p. m. and the two drove to the home of their son around 11:00 or 11:30 p. m. Appellants perfected their bills of exceptions in the absence of the jury showing what both Mrs. Chriceol and Mrs. Noack would have testified. The following testimony was adduced in perfecting the bill covering the testimony that Mrs. Chriceol would have given:

"Q. Then what did you say?.

"A. I said then let's go over to 2622 Roy Circle and spend the night.

"Q. And what did he say?

"A. He said: 'No, I can't. I have to go back to the plant because they have hired me to watch out there on account of the automatic sprinkler being out.' "

Mrs. Noack would have testified, as follows:

"Q. The question I asked you was: Did you hear them have a conversation out there? A. Yes, sir.

"Q. Can you give us any idea as to how long they were outside the door after you laid down? A. About three or four minutes at the most.

"Q. Three or four minutes? A. I guess they said good night and talked a few minutes and then he left.

\*    \*    \*    \*    \*    \*

"Q. What was the conversation you heard between Mr. and Mrs. Elledge? A. She was trying to get him

in to spend the night and he said he couldn't, and she said: 'Let's go over to Roy Circle and spend the night.' And he said he couldn't stay any place because the water tower was broken at the place and he had to stay up there."

■ In our opinion the excluded statements were admissible as res gestae for the purpose of showing where the deceased was going after leaving his wife and the purpose of the trip.

In Texas Employers' Insurance Ass'n v. Brumbaugh, Tex.Civ.App., 224 S.W.2d 761, 763, ref., n. r. e., numerous witnesses were permitted to testify as to statements made by the deceased as to the purpose of his trip and to show that his employer had sent him on a special mission to obtain employees. One of the witnesses was the widow of the deceased, who testified that two days prior to the fatal accident her husband called her by telephone from San Angelo and told her that his employer was sending him to Baird to get some men. The court said:

"The testimony was admissible as res gestae. Since the declarations were made by the deceased before the accident and resulting injuries, it is difficult to see how they could be considered as self-serving. No issue existed at that time between W. C. Brumbaugh and his employer or any one else as to whether or not he was acting in the course of his employment. The declarations of the deceased were contemporaneous with his trip to Baird and his action of seeking employees for Coffee. They were explanatory of such trip and actions. He was acting and talking as one with authority to solicit employees for his employer. The fact of his doing so in the absence of any apparent deliberate sign on his part is admissible as res gestae. Liberty Mut. Ins. Co. v. Nelson, 142 Tex. 370, 178 S.W.2d 514; Hartford Accident & Indemnity Co. v.

Bond, Tex.Civ.App., 199 S.W.2d 293, 296; * * * Maryland Cas. Co. v. Kent, Tex.Civ.App., 271 S.W. 929, 934; Royal Ind. Co. v. Hogan, Tex. Civ.App., 4 S.W.2d 93; Texas Employers Ins. Ass'n v. Shifflette, Tex. Civ.App., 91 S.W.2d 787, 790–91; Texas Employers Ins. Ass'n v. White, Tex.Civ.App., 68 S.W.2d 511, 513–514; Heaton v. Globe Ind. Co., Tex.Civ. App., 71 S.W.2d 328; Lehers v. Federal Underwriters Exchange, Tex.Civ. App., 79 S.W.2d 925, 926; Texas Employers Ins. Ass'n v. Bauer, Tex.Civ. App., 128 S.W.2d 840."

In Prater v. Traders & General Ins. Co., Tex.Civ.App., 83 S.W.2d 1038, 1039, no writ history, the trial court refused to permit the driver of the automobile to testify that deceased, about 8 o'clock at night, came to the lease where he was working and told him that his pump had broken down and he had to go and get some parts for it, and asked the witness if he would carry him to Arp in his automobile. The witness met the deceased about 11:30 p. m., at which time they ate something at the home of the deceased and the deceased then told his wife that they were going to Arp to get some parts for the pump. The accident occurred enroute. The court said:

"It has long been a rule of evidence that the declarations made by a party at or about the time of his departure on a journey are admissible to establish the destination or purpose of the journey. 22 C.J. p. 286, par. 307; Jones, Commentaries on Evidence (2d Ed.) vol. 3, p. 2243, § 1220; Wigmore on Evidence (2d Ed.) Vol. 3, p. 696, par. 1725.

"Some of the authorities hold that such evidence is admissible under the res gestae rule. Texas Employers' Ins. Ass'n v. White (Tex.Civ.App.) 68 S.W.2d 511, par. 7; Wallace v. Byers, 14 Tex.Civ.App. 574, 38 S.W. 228;

Jim West v. State, 2 Tex. 460; Koonse v. Missouri Pacific R. Co., 322 Mo. 813, 18 S.W.2d 467, par. 14; Central of Georgia Ry. Co. v. Bell, 187 Ala. 541, 65 So. 835, par. 7; Chicago, M. & St. P. Ry. Co. v. Chamberlain, Tex.Civ.App., 253 F. 429; Tilley v. Commonwealth, 89 Va. 136, 15 S.E. 526; State v. Garrington, 11 S.D. 178, 76 N.W. 326, par. 3; Harris v. State, 96 Ala. 24, 11 So. 255; State v. Cross, 68 Iowa, 180, 26 N.W. 62; Territory v. Couk, 2 Dak. 188, 47 N.W. 395.

"We believe, however, that the evidence is admissible independently of the res gestae rule, for the simple and sufficient reason that it is the best evidence available to prove the fact at issue. In such cases the fact at issue is the purpose of the journey. The purpose of the journey is wholly dependent on the state of the mind of the declarant, and the declarations made by him are the best evidence of the state of his mind. It is the natural and usual thing for one who is preparing to go on a mission to declare to his associates the purpose of his errand. Such declarations are relied on daily in the business and social world."

In the case of Heaton v. Globe Indemnity Company, Tex.Civ.App., 71 S.W.2d 328, 329, the deceased Heaton at about 9:00 o'clock at night told his son that he wanted to see Harrison about going to work since Jack Larson, his boss, wanted Harrison back on the job, saying: "Jack wanted me to get him to come back to work." The deceased Heaton drove off next morning and met Harrison about 5:30 in the afternoon, at which time Heaton was shot and killed by a bullet intended for Harrison. The court, in holding that the statement made by Heaton to his son the night before he was killed, was res gestae, quoted as follows from the case of McGowen v. McGowen, 52 Tex. 657, at page 664:

" 'The res gestae differs according to the circumstances of the particular case. It may be embraced within the brief compass of time which comprises the duration of the principal act or transaction itself, or it may extend over a much longer period of time, if the transaction be one of a continuing character.' "

The court further stated: "The tendency of recent adjudications is to extend rather than to narrow the scope of the introduction of evidence as part of the res gestae."

We think the cases cited by appellee, including American General Ins. Co. v. Jones, 152 Tex. 99, 255 S.W.2d 502, 505, are distinguishable from the instant case and the cases hereinabove mentioned. In the Jones case the Court made the following statement:

"The claimant says that it was offered to prove mental state. These conversations were not made about the very trip on which he was injured and offered as declarations of his immediate purpose on that night. The mental state of the deceased on other occasions is not in issue."

Moreover, in the Jones case the latest of the conversations relied on was four days before the accident, and such statement then was only with respect to the general duties of the deceased in connection with his employment. In the instant case the statement made by the deceased to his wife was made just before the deceased left her to go to the plant of his employer and it explained where he was going, and the purpose and nature of the trip.

Appellee argues strenuously that there was no direct evidence to show that Paul A. Pfeiffer, the mill superintendent, hired deceased to do any night-watching on the occasion in question, and that the statement that the deceased made to his wife did not identify anyone and merely stated that he had to go back to the plant "because *they* have hired me to watch out there on account of the automatic sprinkler being out." (Emphasis ours.) It was shown that the deceased Elledge had never worked for the Ranger Chemical Company and had worked about fifteen years for Ervine & Bishop; that Pfeiffer was the mill superintendent and vice-principal of Ervine & Bishop, with the power to hire and fire employees; that the deceased took his directions and orders from Pfeiffer; that Pfeiffer actually superintended the operation of the mill itself and also the employees engaged in the operation; and that the deceased, upon leaving his wife, drove to the premises of Ervine & Bishop and was found the next morning dead upon such premises as the result of an accidental injury. We think this sufficiently identifies "they" as Ervine & Bishop, the employer of the deceased.

■ Appellants' Third and Fourth Points of Error are to the effect that the court erred in excluding res gestae statements made by Paul A. Pfeiffer in the presence of the son of the deceased, David Lee Elledge, and Houston Homicide detective, C. B. Massey, within approximately 30 minutes from the time they arrived at the premises of Ervine & Bishop, and at a time when the body of the deceased was lying out in the mud on the premises of his employer.

The appellants perfected their bills of exceptions as to the testimony the police officer, C. B. Massey, and also David Lee Elledge would have given concerning the alleged res gestae statements made in their presence by Paul A. Pfeiffer. It was shown that Officer Massey would have testified that the following statement was made in his presence:

"The water tower was being repaired and due to the fire hazard the company needed someone at the plant at all hours, and this man agreed to sleep there. He was having family trouble temporarily and it worked out well."

It was also shown that David Lee Elledge, if permitted to testify, would have made the following statement:

"Well, Mr. Massey walked up and introduced himself to us and Mr. Pfeiffer told Mr. Massey that my dad had been working there, about his epileptic seizures, and he also told him about the tower being repaired, and they needed somebody to stay there and watch, and he said my dad agreed to stay there temporarily and sleep there."

While it is true that Officer Massey testified that he could not state whether the above statement was made by Pfeiffer or by David Lee Elledge, it was clearly shown by the statement made by David Elledge that it was Pfeiffer who made the statement.

David Elledge also testified that he got to the premises between 8:30 and 9:00; that he had been there about five minutes when Officer Massey came over to where he and Mr. Pfeiffer were, and at such time his dad's body was still lying there with a sheet over it. He further testified that he knew Mr. Pfeiffer well and had seen him quite often and that on this particular morning Mr. Pfeiffer looked like he was nervous and in a hurry. "He wasn't like I have seen him before."

We have concluded that the statement made by Paul A. Pfeiffer in the presence of Officer Massey and David Lee Elledge was res gestae and that the testimony of David Lee Elledge and Officer Massey as to such statement should not have been excluded. The statement was made by the immediate superior of the deceased. It was a spontaneous statement explaining the presence of the dead man on the premises of Ervine & Bishop. The body of the dead man was lying out in the mud with blood on it. We believe that this constituted the required startling event which gave to the statement spontaneity. There is no question but that because of the presence of this trusted employee lying in the field dead under such gruesome circumstances, the declarant Pfeiffer was under the influence of excitement or emotion. He had no reason for fabrication. His statement was not self-serving in any way. It was as if the deceased were speaking through him, explaining his presence on the premises of his employer.

The basis for the admission of such declarations is such spontaneity as precludes design. McCormick and Ray, Vol. 1, Section 915, suggests that an exclamation made by a mother upon seeing a picture of her long-lost son might be as spontaneous as any declaration evoked by the sight of a collision or murder. In our opinion, at least in so far as Pfeiffer was concerned, there was an exciting, startling event which resulted in an emotional response and the existence of an excited state of mind, as corroborated by his appearance and nervousness as testified to by David Lee Elledge.

In one of the leading cases, International & G. N. R. Co. v. Anderson, 82 Tex. 516, 17 S.W. 1039, 1040, the Supreme Court said:

"Another rule, applied in many of the American courts at least, is to admit as parts of the res gestae not only such declarations as accompany the transaction, but also such as are made under such circumstances as will raise a reasonable presumption that they are the spontaneous utterance of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation or design. Travellers Insurance Co. v. Mosley, 8 Wall. 397, 19 L.Ed. 437; Com. v. McPike, 3 Cush., Mass., 181; Hanover Railroad Co. v. Coyle, 55 Pa. 396; Elkins v. McKean, 79 Pa.St. 493; Monday v. State, 32 Ga. 672; People v. Vernon, 35 Cal. 49; Little v. Com., 25 Grat., Va., 921; Harriman v. Stowe, 57 Mo. 93. In most of the cases cited

the declarations admitted were the relation of past occurrences. This line of decision has been followed in this court, (City of Galveston v. Barbour, 62 Tex. 172,) and, in view of the great array of authority in support of that ruling, we deem it best to adhere to it in this case." .

In Harris v. Allison, Tex.Civ.App., 11 S.W.2d 821, 823, error dism., the appellants, defendants in the trial court, offered to prove by a policeman that he received a call to go to the scene of the accident and that some 20 to 25 minutes after the accident he had a conversation with one Jacobs, the driver of the car. The officer asked Jacobs why his car was on the west side of the streetcar track. The answers of Jacobs were excluded by the trial court. The appellate court held:

"However that might be, the statements of Jacobs were res gestae. They occurred in less than 30 minutes after the accident and were voluntarily made in the first statements made by Jacobs and before he had left his car. There could have been no design at the time, but it seems to have been a voluntary declaration as to the facts. It certainly was not self-serving, but it was inculpatory, and the circumstances would preclude the idea of his making false statements that tended to show his own negligence.

"Each case of res gestae must be tested by its own peculiar facts, and it follows that decisions cannot be made guides except in their expressions of general and fundamental rules governing the doctrine of res gestae."

In Martin v. City of Corsicana, Tex. Civ.App., 130 S.W.2d 405, error dism., judgment correct, statements made by the mother of the injured minor plaintiff some 40 to 60 minutes after the injury were held admissible, although the mother was financially interested in the outcome of the matter.

See also Pilkenton v. Gulf, C. & S. F. Ry. Co., 70 Tex. 226, 7 S.W. 805, 808, in which the court made the following statement:

"To be a part of the *res gestae* the declarations are not required to be precisely concurrent in point of time with the principal transaction, if they spring out of it, are voluntary and spontaneous, and are made at a time so near as to preclude the idea of deliberate design. McGowen v. McGowen, 52 Tex. 657. The rule is very latitudinous, and its application must be left largely to the judicial discretion of the trial court. Where the circumstances of the case render it probable that a statement offered as *res gestae* is the result of premeditation or deliberate design to effect a certain purpose, it should not be received."

It is now recognized by our courts that the question whether or not evidence is admissible as res gestae is a law question which an appellate court has the same power to pass on that it has to pass on any other law question. See Pacific Mutual Life Ins. Co. of Cal. v. Schlakzug, 143 Tex. 264, 183 S.W.2d 709.

In City of Austin v. Johnson, Tex.Civ. App., 195 S.W.2d 222, 229, error ref., n. r. e., statements made by one Higgins, the superintendent in charge of the substation work, some 15 to 20 minutes after the accident, were held admissible as res gestae in explanation of how the accident occurred. The statements made by Higgins to one Ashford over the telephone and at the hospital, while the injured man was receiving artificial respiration, were also held admissible. The court made the following statement:

"The rule has been applied to statements made one, two, four, or even five hours after the occurrence of an accident. Texas Employers Ins. Ass'n v. Shifflette, Tex.Civ.App., 91 S.W.2d 787 (writ dismissed); Worley v. In-

ternational Travelers Assurance Co., Tex.Civ.App., 110 S.W.2d 1202; Houston & T. C. Ry. Co. v. Brooks, Tex.Civ. App., 294 S.W. 282; 18 Tex.Jur. 301, § 185. The foregoing statements of Higgins each related to the manner or cause of the happening of the accident, and were each a continuation of that event, and the startling event was simply voicing itself through the witness. The statements were admissible under the rule of res gestae as fully reviewed and reiterated in the recent case of City of Houston v. Quinones, 142 Tex. 282, 177 S.W.2d 259."

See also Southwestern Freight Lines v. McConnell, Tex.Civ.App., 269 S.W.2d 427, error ref., n. r. e.; Texas Employers Ins. Ass'n v. Noel, Tex.Civ.App., 269 S.W.2d 835, error ref., n. r. e.; Harris v. Allison, Tex.Civ.App., 11 S.W.2d 821.

The statement made by Mr. Pfeiffer accounted for the presence of the deceased on the premises of Ervine & Bishop, lying in the mud, clad only in a pair of trousers and a light leather belt. It did not show, of course, in what manner the deceased met his death nor that he died of accidental injuries, but it did explain why he was there, and corroborated the statement made by the deceased to his wife in which he stated where he was going and the purpose for which he was going to the premises of his employer.

■ Appellants' Fifth Point of Error is that the court erred in directing the jury to return a verdict for appellee.

Even if the foregoing res gestae statements had been admitted, there still would not have been sufficient evidence to show that the deceased met his death as the result of an accident, except for the stipulation of counsel that he died on the premises of Ervine & Bishop as the result of an accident. The question remains as to whether there is sufficient circumstantial evidence to show that he died while in the course of his employment for his employer, Ervine & Bishop.

In Texas Employers' Ins. Ass'n v. Shipley, Tex.Civ.App., 260 S.W. 646, 650, error dism., the deceased employee was found dead on the premises of his employer. It was shown that it was customary for the said employee, who was a foreman, to get to work between 6:10 and 6:30 a. m. in order to see that everything was ready for the other employees by 7:00 o'clock. The employee had no duty at the place where his body was found that he could perform in the interest of his employer. The court held, however, that the circumstances of his being where he was on the premises of the employer as was his custom, were sufficient to raise the question for the jury as to whether the deceased was acting in the performance of his duties. The court stated:

"We understand that all courts and all jurisdictions have held that the Workmen's Compensation Act should be liberally construed, and we believe that to hold that Shipley must necessarily have been in actual performance of some service which was in furtherance of his employer's interests at the very moment of his injury would be to give too strict a construction to the act. Unquestionably, he had come to the premises for the purpose of prosecuting his employer's business, in accordance with the custom of several years, as shown by the positive and undisputed testimony."

See Associated Employers Lloyds v. Wiggins, Tex.Civ.App., 208 S.W.2d 705, 706, error ref., n. r. e. The court stated that there was nothing to show that the deceased employee was on a mission of his own at the time he was struck by a bottle while traveling a route customarily traveled in the performance of his duties, although he often went across the street to a drug store or to a cafe. The court quoted from 120 A.L.R. 683, 684, stating:

" 'It is generally held that when it is shown that an employee was found dead at a place where his duties re-

quired him to be, or where he might properly have been in the performance of his duties during the hours of his work, in the absence of evidence that he was not engaged in his master's business, there is a presumption that the accident arose out of and in the course of the employment within the meaning of the compensation acts.'"

The court further stated:

"But even if he had temporarily left his work to go to the cafe or drug store or to run some errand not connected with his employment, we are not prepared to hold as a matter of law that his fatal injuries were not received in the course of his employment. He was struck by the bottle at a place where he often was and would be in carrying out the duties of his employment."

See also American General Insurance Co. v. Jones, Tex.Civ.App., 250 S.W.2d 663, reversed on other grounds 152 Tex. 99, 255 S.W.2d 502.

In the instant case there is nothing to show that the deceased ever left the premises of his employer. He was there, if the res gestae statements are believed, for the purpose of watching, and to protect the premises from fire hazard. It was not necessary for him to be armed or to have a flashlight for that kind of watchman service. The cot showed it had been used. As such watchman he might be inside or outside the buildings; indeed, under certain circumstances he might obtain a better view of any possible fire from outside than from inside. In light of the res gestae statements and the stipulation of counsel, and the attendant circumstances, there is a strong presumption that the deceased sustained his accidental injury while in the course of his employment for Ervine & Bishop. We find nothing in the record that rebuts such presumption. This appeal is from a directed verdict.

We have concluded that there was sufficient evidence from which the jury could find that the fatal injury sustained by the deceased arose out of his employment while in the furtherance of his employer's business.

The judgment of the trial court is reversed and the case is remanded for a new trial.